**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LARRY G. JUNKER | § | CIVIL ACTION |
| *Plaintiff* | § | NO. 2:13-CV-04606 |
| | § | |
| v. | § | |
| | § | |
| | § | THE HONORABLE |
| MEDICAL COMPONENTS, INC. et al | § | MITCHELL S. GOLDBERG |
| | § | |
| *Defendants*. | § | |
| | § | |

**PLAINTIFF LARRY G. JUNKER'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR INTEREST, ATTORNEYS' FEES AND COSTS**

---

### INTRODUCTION

Plaintiff Larry Junker, an individual, brought this suit to enforce his patent rights against clear infringement by two corporate defendants. Despite having known that the patent had been previously tested and affirmed by the Court of Appeals, and after receiving clear notice of the patent and its validity in 2004, Defendants set out on a path of infringement, and then obstruction and vexatious litigation that consumed seven years, involved over 20 defense attorneys, four defense experts, and a dizzying array of discarded legal theories, shifting damages claims, and other specious defenses. In its verdict, the Court rejected the key defense witnesses as incredible, dispatched every remaining defense, found willful infringement, and affirmed that Mr. Junker was the sole and original inventor. For the reasons discussed below, Mr. Junker moves this Court for: (A) an order assessing pre- and post-judgment interest on the judgment amount; and (B) a declaration that this is an exceptional case and an order granting Mr. Junker's

reasonable attorneys' fees and costs under 35 U.S.C. § 285.  Plaintiff also seeks interest on his attorneys' fees.

## LEGAL ARGUMENT

### A. Pre- and Post-judgment Interest

#### 1. Prejudgment Interest

##### a. Whether to award prejudgment interest

Although a grant of prejudgment interest is not automatic, it "should be awarded . . . absent some justification for withholding such an award." *GM Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  As generally stated, "prejudgment interest is the rule, not the exception," *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).  Disgorgement cases where damages are awarded under § 289 are also clearly eligible for prejudgment interest.  *See Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, No. 3:17-cv-01781-HZ, 2018 U.S. Dist. LEXIS 64692 (S.D. Cal. Apr. 17, 2018)* (Order awarding 7% interest).[1]  *See also Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F3d 1277, 1292 (Fed. Cir 2002) (affirming profits and prejudgment interest in a design patent case).

Defendants have willfully infringed Mr. Junker's patent and pocketed profits that rightfully belonged to him beginning at least 12 years ago.  To fully compensate Plaintiff for the loss of use of this money over the years, the court should award prejudgment interest in this case.[2]

---

[1] "In this case, the jury awarded [plaintiff] $3,018,174 under § 289, the 'total profit' from [defendant's] infringement of the Design Patent. According to [defendant], prejudgment interest is unavailable to [plaintiff] because it can only be recovered under § 284. [Defendant's] position is without legal support and at odds with cases that have applied prejudgment interest to patent infringement awards for total profit under 35 U.S.C. § 289." (citing cases)

[2] Anticipating a counterargument, the long delay between infringement and judgment should generate a significant amount of prejudgment interest, but this is not a windfall for Plaintiff, it is an equitable remedy, the size of which demonstrates the true measure of damage inflicted by Defendants, not only in their infringement, but in their years-

### b.  The proper rate of interest

The trier of fact must determine what rate of interest will make the successful litigant whole.  In other words, had the money been in the hands of Plaintiff, and not wrongly withheld by Defendants, what would he have done with that money, and how would it have grown over time?  Some courts have looked at the specific circumstances of the successful litigant, and others have attempted to find a seemingly objective rate to stand in as a proxy.  Neither solution is exact, and the court has latitude to make its own judgment. "As to the rate of interest to be awarded, "[i]n federal question cases, the rate of prejudgment interest is committed to the discretion of the district court." *Sun Ship, Inc. v. Matson Navigation Co.,* 785 F.2d 59, 63 (3d Cir. 1986)."  *Univ. of Pittsburgh v. Varian Med. Sys.*, No. 08cv1307, 2012 U.S. Dist. LEXIS 58156, at *30 (W.D. Pa. Apr. 25, 2012) (6% interest compounded quarterly).

Pennsylvania's statutory rate of 6% is frequently applied in federal cases in Pennsylvania, including patent cases.  "The United States Court of Appeals for the Federal Circuit has affirmed awards of prejudgment interest at the Pennsylvania statutory rate of 6%." *Air Vent, Inc. v. Vent Right Corp.*, No. 02: 08-cv-00146, 2011 U.S. Dist. LEXIS 55246, at *4 (W.D. Pa. May 24, 2011) (citing *Railroad Dynamics, Inc. v. A. Stucki Co.*, 579 F. Supp. 353, 375 (E.D. Pa. 1983), *aff'd*, 727 F.2d 1506 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 871, 105 S. Ct. 220 83 L. Ed. 2d 150 (1984)).  "As in other cases, the Court finds that a six percent statutory interest rate, the Pennsylvania statutory rate, will be applied and will be compounded quarterly . . .". *Drone Techs., Inc. v. Parrot S.A.*, No. 14cv0111, 2015 U.S. Dist. LEXIS 76519, at *28 (W.D. Pa. June

---

long fight to deny Mr. Junker justice.  Defendants, willfully infringing, could have paid up at any time.  Here there is no delay prejudicial to Defendants caused by Plaintiff.  *See Lummus Indus. v. D.M. & E. Corp.*, 862 F.2d 267 at 274 (Fed. Cir. 1988)*.  See also Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 791-92 (Fed. Cir. 1990) (rejecting request for denial of interest based on delay because the delay was not caused by plaintiff and was "neither undue nor unjustified").

12, 2015) (citing *University of Pittsburgh v. Varian Medical Systems, Inc.*, 2012 U.S. Dist. LEXIS 58156, 2012 WL 1436569 (W.D. Pa. April 25, 2012)). *See also*, *Checkpoint Sys. v. All-Tag Sec. S.A.*, No. 01-2223, 2015 U.S. Dist. LEXIS 161352 (E.D. Pa. Dec. 2, 2015) (awarding PA statutory 6% interest rate.)  Notably, all these cases are patent cases.

Courts have also used a variety of benchmarks rates, including the Prime Rate, the 52-week treasury ("T-Bill") rate[3], and even the IRS overpayment rate.  See *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Arlington Indus. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2014 U.S. Dist. LEXIS 85945 *13 (M.D. Pa. June 23, 2014) (citing 26 USCS § 6621).  But in this era of cheap lending, these benchmark rates (Prime Rate currently 3.25%[4]) are not fair proxies for the time value of money wrongfully withheld.

These benchmark rates have been used as proxy for how the successful litigant might actually have benefited from the use of money.  If the Court seeks such a benchmark in this case, however, considering the realities of today's economic circumstances, a more realistic proxy for the returns an individual investor such as Mr. Junker would have expected to earn would be an index fund tracking the S&P 500, which from 2009 through 2020 grew at an average annual rate of 13.15%.[5]  This is a very common and relatively conservative modern investment.

---

[3] The 52-week T-Bill rate was 0.06% as of 2/05/21 and averaged 0.67% for the years since infringement began in this case.  By contrast, in 1981, the T-Bill rate was more than 20 times today's rate and well outpaced inflation, today it does not.  Simply depositing money into a savings account or purchasing a 1-year certificate of deposit yields a return at least 5 times the current T-Bill rate.  In this era of historically low interest rates, T-Bills, CDs, and savings accounts are no longer vehicles by which individuals seek to grow their money. *See* https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=billrates; https://www.macrotrends.net/2492/1-year-treasury-rate-yield-chart; https://www.macrotrends.net/countries/USA/united-states/inflation-rate-cpi.

[4] https://www.wsj.com/market-data/bonds/moneyrates

[5] https://www.macrotrends.net/2526/sp-500-historical-annual-returns

These proxy rates, however, while they may serve expediency, do not answer the question that is before this court: what would Mr. Junker actually have done with the money had Defendants paid him their illicit profits as they collected them?

Courts have departed from the actual rate of return achieved by a Plaintiff and chosen a proxy rate when there is a lack of evidence about how the Plaintiff would actually have used the money. *See e.g.*, *Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 262 F. Supp. 3d 118, 149-50 (E.D. Pa. 2017) (rate adopted because litigant "presented no evidence" of its borrowing or investing.); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (no abuse of discretion where district court awarded rate when absent evidence of patent holder's borrowing or investing).

However, when there is actual evidence of what rate a successful litigant has returned on investment during the period at issue, courts are free to adopt that rate for prejudgment interest. "Where a patent holder can show evidence of the actual investment rate it would have earned, or the actual borrowing rate it would have avoided, courts have used that rate as the prejudgment interest rate." *Mars, Inc. v. Coin Acceptors*, 513 F. Supp. 2d 128, 133 (D.N.J. 2007) (*citing Micro Motion Inc. v. Exac Corp.*, 761 F. Supp. 1420, 1436 (N.D. Cal. 1991) (rejecting the T-Bill rate in light of evidence that the patent holder invested all of its additional cash into a specific account that earned higher rates); *Sun Studs Inc*, 1990 U.S. Dist. LEXIS 18672, at *8 (finding that "Plaintiff is entitled to be compensated for the actual amount of interest it paid" on borrowed money)). *See also*, *In re Bankers Tr. Co.*, 658 F.2d 103, 112 (3d Cir. 1981) (awarding 10.5% interest based on litigant's actual rate of return).

Mr. Junker has been in the business of designing, manufacturing and selling medical products for over 45 years. His business regularly returns in excess of 15% on investments. Had

he been paid disgorged profits as they were generated, he would have invested it in his business and returned more than 15% year on year.  Declaration of Larry G. Junker, ¶5.  This is the rate of interest that would come closest to actually making Plaintiff whole.

While a variety of options present themselves, the proper rate at which interest should be applied to make this Plaintiff whole is his actual rate of return, 15%.  If the Court were instead to choose a proxy rate, it should be 13.15%, the rate of growth of a conservative investment in the stock market.  Otherwise, the Court at a minimum could rely on the well-supported Pennsylvania statutory rate of 6% used in patent cases by other courts.

### c.  Compounding

"If pre-judgment interest is awarded, the Court has the discretion to award simple or compound interest. *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1555 (Fed. Cir. 1995). If the Court awards compound interest, the Court may determine how often the interest should be compounded. *Drone Techs., Inc. v. Parrot S.A.*, No. 14cv0111, 2015 U.S. Dist. LEXIS 76519, at *28 (W.D. Pa. June 12, 2015) (vacated on other grounds) (citing *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988)). "Further, '"[i]n applying prejudgment interest, courts have recognized that compounding is necessary to fully compensate the patentee. Because a patentee's damages include the forgone use of money, compounded is needed to account for the time value of money.'" *Church & Dwight Co. v. Abbott Labs.*, No. 05-2142 (GEB)(LHG), 2009 U.S. Dist. LEXIS 64459 at *31 (D.N.J. July 23, 2009) (quoting *Mars, Inc. v. Coin Acceptors*, 513 F. Supp. 2d 128, 137 (D.N.J. 2007).  *See also Air Vent, Inc. v. Vent Right Corp.*, No. 02: 08-cv-00146, 2011 U.S. Dist. LEXIS 55246 (W.D. Pa. May 24, 2011) (awarding interest compounded monthly). Plaintiff seeks to recover interest based on Defendant's annually tabulated profits and, for simplicity, suggests that annual compounding is also appropriate.

### d. Calculating interest

In *Devex*, the Court made it clear that interest accrues when damages accrue.  *Devex*, *supra*, 461 U.S. at 655-56.  In the present case, interest should be awarded from the time Defendants earned their ill-gotten profits.  The Court awarded Plaintiff disgorged profits as calculated by Defendants' damages expert Trexler.  Her summary also breaks down those profits by year, and Plaintiff proposes calculating interest due for each year's profits, 2009-2014, from that year until the date of judgment, Jan. 14, 2021, and adding the interest due from each year's profit for a total amount of pre-judgment interest due.[6]

This table demonstrates interest calculated[7] at suggested rates, compounded annually, through 2020:[8]

| Year of sale | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total Interest |
|---|---|---|---|---|---|---|---|
| Disgorged profit | $9,753 | $442,983 | $624,540 | $65,539 | $104,949 | $146 | $1,247,910 |
| 15% interest | $38,906 | $1,478,844 | $1,731,538 | $149,458 | $194,424 | $216 | **$3,593,386** |
| 13.15% interest | $30,627 | $1,177,931 | $1,395,121 | $121,772 | $160,137 | $180 | **$2,885,769** |
| 6% interest | $9,308 | $373,785 | $461,801 | $42,008 | $57,521 | $67 | **$944,490** |

## 2. Post-judgment Interest

Mr. Junker is also entitled to post-judgment interest pursuant to 28 U.S.C. § 1961:

---

[6] Specifically, the Court awarded $1,247,910 in disgorged profits, of which Defendants earned $9,753 in 2009, $442,983 in 2010, $624,540 in 2011, $65,539 in 2012, $104,949 in 2013, and $146 in 2014.  *See* D. Tr. Ex. 155, Ex. 1.1, Scenario 1B

[7] These calculations can be confirmed by a compound interest calculator, e.g.: https://www.thecalculatorsite.com/finance/calculators/compoundinterestcalculator.php.  *See* James D. Petruzzi Declaration, (hereinafter "JDP Decl.") ¶3 and Ex. A for interest calculation description.

[8] For ease of calculation Plaintiff agrees to waive prejudgment interest for the first two weeks of 2021, and here calculates interest for whole years through 2020.  Average age of profits is assumed by calculating from the middle of the year they were acquired, or July 1.  See JDP Decl. ¶3.

> (a) Interest shall be allowed on any money judgment in a civil case recovered in a district court…Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

Plaintiff therefore seeks an award including post-judgment interest from January 14, 2021, until paid in full, as allowed by statute.  A total calculation of *post-judgment* interest should await entry of a final judgment and payment by Defendants.

### B.  Exceptional Case (35 U.S.C. § 285) & Attorneys' Fees and Costs

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285; *see Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755-56 (2014) (affirming the power to award attorney fees in exceptional cases).  Mr. Junker is the "prevailing party" by way of this Court's January 14, 2021 Order entering judgment on his behalf. Dkt. 305.  This Court may award Plaintiff Junker's requested fees and non-taxable costs if the Court finds this case "exceptional."

The U.S. Supreme Court has determined that:

> an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Octane Fitness,* 134 S. Ct. at 1756 (citations omitted).  The *Octane Fitness* Court suggested that in determining whether a particular case is exceptional "district courts could consider a "nonexclusive" list of "factors," including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id*. at 1756 n.6.

*Octane Fitness* greatly relaxed the § 285 "exceptional" standard set forth in prior decisions and permits the Court to consider the totality of the circumstances. *See Octane Fitness*, 134 S. Ct. at 1754, 1758 ("we reject" the Federal Circuit's "more rigid and mechanical formulation" announced in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). Indeed, the earlier *Brooks Furniture* standard required a finding of no less than "material inappropriate conduct related to the matter in litigation, such as willful infringement," to support an exceptional case finding. *Octane Fitness*, 134 S. Ct. at 1754, 1758 (noting that *Brooks Furniture* is "so demanding that it would appear to render § 285 largely superfluous" considering the court's inherent power to shift fees based on litigation misconduct).

The *Octane Fitness* Court also relaxed the burden of proof. Now, establishing § 285 exceptionality requires proof by only a preponderance of the evidence. The Supreme Court noted, "we reject the Federal Circuit's requirement that patent litigants establish their entitlement to fees under § 285 by 'clear and convincing evidence,'" *Octane Fitness*, 134 S. Ct. at 1758 (citing *Brooks Furniture*, 393 F.3d, at 1382). "[§ 285] imposes no specific evidentiary burden, much less such a high one." *Id*. (quotation marks and internal citation omitted). Plaintiff Junker requests that this Court find, based on the totality of the circumstances and by a preponderance of the evidence, that this case is exceptional and order Defendants to award Plaintiff reasonable attorney fees, appropriately enhanced, and certain non-taxable costs pursuant to 35 U.S.C. § 285.

### 1. This Court has Already Determined that Defendants Willfully Infringed the D'839 Patent

A finding of willful infringement, alone, was historically a sufficient basis for a finding that the case is exceptional under § 285. Although willfulness is not dispositive of the question of "exceptionality", the Federal Circuit has regularly upheld discretionary district court awards of attorney fees when there was a finding of willful infringement. *See, e.g., Bott v. Four Star*

*Corp.*, 807 F.2d 1567, 1574 (Fed. Cir. 1986) ("In view of the finding of willful infringement, the discretionary award of attorney fees was entirely proper.") (overruled on other grounds); *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F2d 1557, 1567 ("[T]he willfulness of the infringement provided a sufficient basis for a section 285 attorney fee award to the prevailing patent owner.")

In *Stryker Corp. v. Zimmer, Inc.*, the district court determined pre-*Octane Fitness* that the case was exceptional and awarded attorneys' fees solely based on a finding of willful infringement.  837 F.3d 1268, 1279 (Fed. Cir. 2016).  The Federal Circuit remanded the exceptional determination for reconsideration in light of *Octane Fitness*. *Id.*  On remand, the district court reinstated the exceptional finding and fee award, stating, "[t]he jury's 'subjective willfulness' finding was sufficient for an 'exceptional' case finding under the rigid *Brooks* framework, and is certainly sufficient for such a finding under the more flexible, totality-of-the-circumstances standard enunciated by *Octane Fitness*." *Stryker Corp. v. Zimmer, Inc.*, No. 1:10-CV-1223, 2017 U.S. Dist. LEXIS 162440, at *17 (W.D. Mich. July 12, 2017) (affirmed *per curiam* by *Stryker Corp. v. Zimmer, Inc.*, 745 F. App'x 167, 168 (Fed. Cir. 2018)).  The same is true here.

Moreover, just as it is incumbent on a trial court to articulate a basis for finding a case exceptional, "[i]t is equally necessary for the trial court to explain why this is not an exceptional case in the face of its express finding of willful infringement." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986); s*ee also Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 U.S. Dist. LEXIS 78365, at *68 (E.D. Tex. June 16, 2016) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (citing *S.C. Johnson* for this principle); *Energy Heating, Ltd. Liab. Co. v. Heat On-The-Fly, Ltd. Liab. Co.*,

889 F.3d 1291, 1307 (Fed. Cir. 2018) (in an analogous case, citing *S.C. Johnson*, requiring an explanation of why the case was not exceptional in the face of an express finding of inequitable conduct).

This Court has already determined that Defendants willfully infringed the D'839 patent based on their receipt of notice of the D'839 patent (along with notice that they had been purchasing and selling a product which infringed it).  Dkt. 305, p. 18 FN3, p. 35 FN12. Defendants' awareness and relevance of the Junker patent was continuous, right up to their initial sales, as it was cited by them to the Patent Office in 2005 and 2009 during their own patent filings.[9]  Under the *Stryker* decisions, Defendants' willful infringement alone is a sufficient basis for a finding that this case is exceptional.  But the Court need not base exceptionality on willfulness alone.  As discussed below, Defendants' unreasonable litigation tactics over the past seven years further give rise to a finding that the case is exceptional and an award of attorneys' fees and costs.

### 2.  Defendants Litigated this Case in an Unreasonable Manner

Misconduct, in many forms, "'can support a district court's exceptional case finding, including . . . litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit; or willful infringement.'" *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, Civil Action No. 14-cv-1451-RGA, 2020 U.S. Dist. LEXIS 71711, at *6 (D. Del. Apr. 23, 2020) (quoting *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013)).  Under *Octane*, "while the individual acts of misconduct might not make Defendants' conduct look exceptional, Defendants' conduct over the course of the entire litigation support the

---

[9]Plaintiff has now discovered through public patent office filings, that Defendants and their CEO Mr. Schweikert not only knew about the Junker patent well before infringement began, but cited the D'839 patent as relevant prior art to at least two of their own utility patents.  See U.S. Patents Nos. 7,938,806 and 7,422,571 and Information Disclosure Statements filed in April 2005 and March 2009.  JDP Decl, Ex. G.

conclusion that this is an exceptional case." *Drop Stop Ltd. Liab. Co. v. Zhu*, 757 F. App'x 994, 999 (Fed. Cir. 2019) (internal quotation marks, citations omitted).

In a recent decision in the District of Delaware, the district court initially awarded the prevailing party over $8,000,000 in attorney fees and expenses after finding the case exceptional based on both willful infringement and unreasonable litigation tactics. *See SRI Int'l, Inc. v. Cisco Sys.*, 254 F. Supp. 3d 680 (D. Del. 2017). After consideration on appeal, the Federal Circuit remanded the matter to the district court to reconsider willfulness, the exceptional finding, and the award of fees. On remand, the district court determined that there was not sufficient evidence to support the jury's willfulness finding but reinstated the original exceptional finding and the award of $8,000,000 in fees and costs. The court noted with approval the earlier district court decision that based its award of fees and costs "not only the unreasonable manner in which the case was litigated, but also the lack of substantive strength that informed the decision to award attorney's fees for the whole case, not just individual acts of unreasonable litigation. Nothing in that regard has changed." The 2017 decision found that the defendant's case "lacked substantive strength, as its trial defenses were weak, 'all of [its summary judgment defenses] were denied,' and 'every line of defense post-trial. . . has been denied.'" *SRI Int'l, Inc. v. Cisco Sys.*, No. 13-1534-RGA, 2020 U.S. Dist. LEXIS 46775, at *11-12 (D. Del. Mar. 18, 2020) (appeal pending).

As in *SRI*, none of the issues on which Defendants moved for summary judgment were successful, and despite bringing a laundry list of defenses to trial, Defendants succeeded on none. Dkt. 305. Moreover, Defendants engaged in a host of unreasonable litigation tactics for over 7 years. Plaintiff identifies but a few of the most egregious.

### a. Unreasonable Litigation Tactics

### 1.  Defendants' Misrepresentations regarding damages

The tortured path regarding damages is well documented in Plaintiff's Memorandum Regarding Prejudice (Dkt. 295).  However, it bears repeating that throughout 7 plus years of this case, Defendants' damages data and theories were constantly changing and bore little relationship to the documented facts.  This occurred despite Plaintiff's repeated efforts to get Defendants to acknowledge and conduct negotiations based on reality, making any sort of pretrial resolution of this matter impossible.

These damages misrepresentations were not limited to malfeasance associated with expert reports.  Rather, they commenced at the outset of this litigation.  In November of 2013, in the context of settlement discussions, Defendants produced data representing that total profits of accused products were less than $50,000. On October 8, 2013, shortly after suit was filed in August, Plaintiff's counsel said: "We expect this to include all models with rounded ears, regardless of the angle of the handle, at this stage, so we can evaluate the scope of the litigation." Mr. Zaher then responded on November 5, 2013 in part "As you should know, our client only received 10K [sic] authorization from the FDA to sell this type of product this summer [2013]." Later Mr. Zaher said: "With your confirmation, we will send you a spread sheet showing all sales in the US and abroad as well as the clients estimate of profits for the entire kit."  A few days later, on November 9 Defendants produced a spreadsheet printout showing total profits under $50,000.  *See* emails from Joel Dion and Alfred Zaher to Jim Petruzzi, November 5 and 8, 2013, JDP Decl., ¶15 and Ex. H.

Just a few months later (May 2014), Defendants produced discovery data demonstrating sales of accused products in excess of $15,000,000 and introducer sheath profits in excess of $800,000 (all to be later retracted in subsequent statements).  *See* Pl. Tr. Ex. 30.2.  It defies

credibility that Defendants represented in good faith these wildly disparate positions in such a short span of time.  While offers of settlement and negotiations of parties are generally not admissible under the Federal Rules of Evidence, there are exceptions to the rule's general exclusion.  Fed. Rules Evid. R. 408(b) states, "The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  Courts have found use of evidence otherwise protected by Rule 408 proper for considerations of bad faith.  *See, e.g., Seafarers Int'l Union of N. Am. v. Thomas*, 42 F. Supp. 2d 547 (3d Cir. 1999); *Athey v. Farmers Ins. Exch.*, 234 F.3d 357, (8th Cir. 2000); *Ausherman v. Bank of Am. Corp.*, 212 F. Supp. 2d 435, 436 (D. Md. 2002) (FRE 408 "did not shelter the lawyer's attempt to shield from the court's scrutiny deliberately untruthful statements of material fact communicated to opposing counsel in settlement negotiations relating to pending litigation.")

Even before this Court, Defense counsel asserted at the claim construction hearing and in opening at trial that there were no significant damages.  At the Claim Construction hearing May 9, 2017, Mr. Zaher stood before the Court and perpetuated these apparent misrepresentations:

"First, let me just clarify the damage number. It's like $40,000 or $60,000. Why? Is there a big difference? And counsel knows this full well. And our expert will testify that the data that they had used -- because we had to change experts in the last week of the case because my expert became unavailable. We changed experts. They had to -- and during the process of calculation, they used data that was outside the date range -- and counsel knows this full well -- outside the date range of any possible infringement for -- because our client sells millions and millions and millions of pieces of these products. They have non-infringing product.

So our client produced the information to the expert. The expert erroneously calculated the non-infringing products. When they took them out -- so with the non-infringing products you get this million some odd. With the correct calculation you get $60,000. And he knows that, but why he keeps insisting on repeating the erroneous data

> calculation I don't know. If we have to, our expert will testify that it was an erroneous
> calculation. Counsel knows that, but I guess $1 million sounds better than $40,000."

TR pp. 38-39, 5.9.17 Hearing on Claim Construction.  These statements were repeated in

summary judgment arguments on February 1, 2018.  Tr. pp. 52-54, 2.1.18.  And again, at the

Pre-Trial conference Mr. Zaher continued to argue the late hiring of Trexler Smith somehow

affected the production of accurate data for damages.  January 21, 2020 Hearing, TR., p. 41,

1.21.20.  Defendants then made tactical use of the so-called "Restrepo Cure" as a vehicle to

attack Plaintiff's counsel for not taking the expert's deposition and as a basis to generate yet

another late produced set of data.  But as Ms. Trexler Smith testified, she would have provided

the same incorrect data had she been deposed in 2015.  NT, Vol 9, p. 62.  As we know now,

there was no "miscalculation," the earlier damages numbers were accurate (though incomplete),

and 5 years of blatant misrepresentations (either by Defendants, their counsel, or both) derailed

any hope of reasonable and timely pretrial resolution of this case.

    The misrepresentations on damages to the Court also support an exceptional case finding

and further rise to the level of bad faith, which the Court reserved in its ruling on prejudice. *See*

Dkt. 295 (sanctioning Defendants for timing and tactics surrounding damages).  Indeed, in its

Order finding prejudice related to the damages sequence, the Court stated:

> Although I choose not to reach the question of bad faith in connection with
> Defendants' conduct, I find that the late disclosure of Scenario 1D was a willful
> failure to comply with the Court's scheduling orders and the requirements of Fed.
> R. Civ. P. 26.

Dkt. 298, p. 9.  It is time to reach this question of bad faith.  This conduct by Defendants

exemplifies how the case was litigated on every front from the very beginning.  Even a cursory

review of the extensive relevant facts (Dkt. 295, pp. 3-5) demonstrates that Defendants'

unreasonable and bad faith litigation tactics caused Plaintiff extensive and unreasonable expenditure of time and expense before and during trial.

### 2. Weak, Unsupported, and Abandoned Legal Theories

- A listing of the various defenses from the pleadings demonstrates the unsupported legal theories that Defendants pursued during the litigation, forcing Plaintiff to pursue discovery and motion practice to attempt to defeat them over the course of the litigation.  Below is the list of theories of invalidity and defenses that Defendants asserted in their Answer, Second Amended and Third Amended Answers Dkt. Nos. 11, 51-3, and 140.  The only defenses that Defendants ultimately presented at trial are those not crossed out:

- ~~Failure to State a Claim~~
- ~~35 U.S.C. 101~~
- 35 U.S.C. 102
- 35 U.S.C. 103
- ~~35 U.S.C. 112~~
- ~~35 U.S.C. 132~~
- 35 U.S.C. 171
- ~~waiver,~~
- ~~estoppel~~
- ~~laches~~
- ~~unclean hands~~
- ~~patent misuse,~~
- ~~common law fraud~~
- inequitable conduct.
- ~~prosecution history estoppel~~
- ~~On Sale Bar~~
- ~~Marking~~

- Notably, the only prior art arguments under 35 U.S.C. 102/103 pursued at trial involved Gillespie, Gisselberg, Groshong, Bley, and Jamshidi.  But compare this to Interrogatory Answers setting forth over 20 references under section 103.  Dkt. 119-12.  Further, the common law fraud claim was utterly frivolous, there being no basis for a claim based on statements to a third party, the USPTO, to predicate liability.  See Dkt. 137, p. 3, FN4.

- Defendants' inventorship and inequitable conduct theories were largely based on misrepresentations made regarding Gillespie inventorship and were not well supported by Eddings or Gillespie.  Indeed, their testimony in this litigation was explicitly contrary to previous testimony by both witnesses. *See* Dkt. 305, p. 49, n 15.  Defendants appear to have suborned perjury from Gillespie and Eddings to create a new and wholly unsupported story of invention.

- As fully laid out in an early Motion to Strike, the chronology of improper activity by Defendants running up to the original discovery cutoff is noteworthy.  *See* Dkt No. 132.  This motion, like many others, was an attempt by Plaintiff to point out to the Court the vexatious nature of Defendants' litigation tactics and how it was hampering his pre-trial discovery of basic facts and issues in the case.  *Id*., *see* p. 3 for short chronology.  It also demonstrates Defendants' early violations of Rule 26 that persisted throughout the case culminating in the Court's sanction for prejudice relating to damages.  This motion further chronicles Defendants' late production of witness names, documents, and expert opinions.  And much of this activity ultimately either led to outright rejection by the Court of a theory of defense, rejection of evidence or ended in abandonment of witnesses by Defendants, including Chatburn, Throneberry, and Cohen.

- Defendants pursued three new theories of damages on the eve of trial, rejected by this Court as late, unfounded with respect to marking, or prejudicial.  Dkt. 292.  Again, Plaintiff's legal team of 3 attorneys, with no stable of associates to call into action, was being asked to

respond to brand new theories with significant impact during the critical preparation days immediately before trial, and *years* after the close of discovery. *See* Dkt. Nos. 272, 295.

- Defendants pursued a specious marking argument that was rejected. "Here, there was no evidence that Plaintiff had actually produced and sold the patented product. In fact, Plaintiff expressly represented that he had not. Therefore, it follows that Plaintiff is not subject to § 287's notice requirement." Order on Motions In Limine, Dkt. 292, p. 4. Nor is there a notice requirement for § 289 disgorgement profits. *Id*. at 5. This was Plaintiff's position from the outset and no contrary evidence has ever existed. Further, Defendants neither called nor produced any witness from Bard regarding product marking to support this specious theory. It was rejected out of hand. *Id*.

### 3.  Vexatious and Excessive Litigation Techniques

- Defendants spoliated evidence, destroying and failing to preserve kits containing the accused products. Defendants' own data (D. Tr. Ex. 156a, 158a, 162) demonstrates that at the time Mr. Junker filed this suit in 2013, Defendants were selling the infringing product, individually and in kits, and continued to do so into 2014. Early in the litigation, Plaintiff sought from Defendants examples of kits containing the accused products. Rather than turn over any such kits, Defendants destroyed them. *See* Dkt. 295, pp. 7-9. This was bad faith, plain and simple, that caused extensive additional work by Plaintiff's counsel.[10]

- Defendants moved to reconsider the Court's detailed Order on Summary Judgment, arguing nothing more than the Court should have ruled the other way. *See e.g.,* Dkt. 222. The Court denied this after further briefing finding "Defendants' disagreement with the result of my

---

[10] *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him") *See also Bull v. UPS*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer*).

decision does not rise to the level of a clear error of law or manifest injustice. *See Williams*, 32 S. Supp. 2d at 238.  This type of argument is an inappropriate basis for reconsideration. *Id*. ('A motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly.')"  Dkt. 237, ¶18.

- Defendants represented third-party witnesses, asserting improper attorney client privilege to block Plaintiff's inquiry.  During the deposition of Mr. Gillespie for trial, in which he was represented by his own counsel,[11] he was instructed not to answer question on the basis of a specious "common defense" privilege.[12]  This was part of a pattern of defense counsel inserting themselves between fact witnesses and Plaintiff so Plaintiff could not learn relevant information regarding pre-deposition preparation, what documents were reviewed, or what discussions took place with Defendants regarding the case.  This occurred at the Gillespie and Eddings discovery depositions as well.

- In spite of their ongoing contention that this case had *di minimus* damages value, no better example of Defendants' vexatiously litigating this case and multiplying the proceedings can be found than the number of attorneys that appeared on their behalf.  While Plaintiff had one principal attorney, Mr. Petruzzi, for most of the case and then added assistance during the case and for trial, no fewer than **20 attorneys** appeared on behalf of Defendants, not to mention an unknown number of non-appearing attorneys and staff, as apparent by the size of the crowd they brought to trial.  JDP Decl. ¶9, Ex. F.  Defendants employed three partner level attorneys for the entire trial and were aided by two additional associates and a paralegal at times. Again, this

---

[11] Apparently an "independent" counsel for Mr. Gillespie was Defendant's response to Plaintiff's complaints about their improper direct representation of third-party witnesses.
[12] Thus, spoiling any illusion of independence.

extreme expenditure of resources occurred for a case they asserted was worth no more than tens of thousands of dollars.

- Similarly, Defendants retained four experts over the course of the litigation, including two former commissioners of the USPTO, each of whom billed Defendants at rates as high as $975/hr.: Dickinson $975/hr., Mossinghoff $730/hr., Trexler-Smith $430 /hr., and Meyst: $425/hr. JDP Decl., ¶9, Ex. F. Again, in spite of the purported nuisance value of this case, damages expert Trexler admitted at trial that she had already been paid some $85,000 for her work on the matter. TR Vol. 9, 17:17-21.

- Defendants ignored the Court's pre-trial orders and haphazardly and untimely produced exhibits, disclosed witnesses and generated wholly new legal theories. *See* Dkt. 242 at 8-9, 247, 272. These actions not only caused Plaintiff to incur substantial unnecessary legal fees, but also distracted from and impeded Plaintiff's preparations for trial.

- Defendants did not rely on advice of counsel, nor did they produce any opinion of counsel. Indeed, they refused to provide any information about such an opinion throughout discovery or at trial and never asserted reliance on one to defend against a willfulness finding. JDP Decl. Ex. E; Jury Instruction 9.4, Dkt. 267. *See Aspex Eyewear Inc. v. Clariti Eyewear Inc*., 605 F.3d 1305, 1313 (Fed. Cir. 2010) (holding that timing and the content of an opinion of counsel is important in determining whether the accused infringer engaged in objectively reckless behavior).

Plaintiff recognizes that zealous litigation may not constitute bad faith or vexatious litigation to support an award of fees and costs. However, in this case the activities identified herein are not merely normal litigation efforts, but rather a pattern of unreasonable and vexatious conduct wholly unrelated to the proper pursuit of the truth. Defendants have engaged in the kind

of "extensive misconduct [that] was enough to comprise an abusive pattern or a vexatious strategy that was pervasive enough to infect the entire litigation." *Monolithic Power Sys.*, 726 F.3d at 1369 (Fed. Cir. 2013) (internal quotation marks excluded).  This, coupled with defense counsel's repeated apparent misrepresentations establishes the requisite facts to support an exceptional case finding.

Based on the foregoing, as this Court has already determined the Defendants to be willful infringers and upon a review of Defendants' unreasonable litigation tactics throughout this litigation, Plaintiff asks this Court to find this case exceptional under the totality of the circumstances and to award Plaintiff reasonable attorney fees and non-taxable costs.

<u>**PLAINTIFF'S REASONABLE AND NECESSARY FEES AND COSTS**</u>

**A.  Lodestar Calculation of Fees**

In determining reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the "guiding light of [its] fee-shifting jurisprudence." *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010) (quoting *Gisbrecht v. Barnhart*, 535 U.S. 789, 801, 122 S. Ct. 1817, 152 L. Ed. 2d 996 (2002)). "In the Third Circuit, courts calculate attorneys' fees pursuant to the 'lodestar' approach, which requires multiplying the amount of time reasonably expended by reasonable hourly rates." *Lugus IP, LLC v. Volvo Car Corp.*, No. 12-2906 (JEI/JS), 2015 U.S. Dist. LEXIS 38342, at *15-16 (D.N.J. Mar. 26, 2015) (citing *Tech. Innovations, LLC v. Amazon.com, Inc.*, No. CV 11-690-SLR, 2014 U.S. Dist. LEXIS 100061, 2014 WL 3703582, at *2 (D. Del. July 23, 2014) (*citing Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir. 2000)))."

The determination of a reasonable attorney fee requires the court to consider all the relevant circumstances in a particular case, which the Federal Circuit reviews for abuse of

discretion.  *Junker v. Eddings*, 396 F.3d 1359, 1365 (Fed. Cir. 2005) (billed rate not a ceiling to

reasonable demonstrated reasonable rates) (citing *Pharmacia & Upjohn Co. v. Mylan Pharms.,*

*Inc.*, 182 F.3d 1356, 1359 (Fed. Cir. 1999); *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 674

(Fed. Cir. 1988)).  "First, the plaintiff bears the burden of establishing a prima facie case by

producing sufficient evidence of what constitutes a reasonable market rate "for the essential

character and complexity of the legal services rendered." *Smith v. Phila. Hous. Auth.*, 107 F.3d

223, 225 (3d Cir. 1997).

"A reasonable market rate is 'calculated according to the prevailing market rates in the

relevant community.'" *Arlington Indus. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2016

U.S. Dist. LEXIS 83493, at *5 (M.D. Pa. June 28, 2016) (citing *Rode v. Dellarciprete*, 892 F.2d

1177, 1183 (3d Cir. 1990)).  "In most cases, the relevant rate is the prevailing rate in the forum

of the litigation." *Vehicle Interface Techs., LLC v. Jaguar Land Rover N. Am., LLC*, No. 12-

1285-RGA, 2016 U.S. Dist. LEXIS 77612, at *7-8 (D. Del. June 15, 2016) (citing Bywaters, 670

F.3d at 1232-33). And "'the current market rate must be used,' which is 'the rate at the time of

the fee petition, not the rate at the time the services were performed.'" *Arlington Indus.*, 2016

U.S. Dist. LEXIS 83493, at *7 (citing *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001)

(relying *inter alia* on AIPLA survey to determine reasonable rates)).

"If the plaintiff fails her burden to establish a prima facie case of a reasonable hourly rate,

the Court must exercise its discretion in fixing a reasonable hourly rate."  *Becker v. ARCO*

*Chem. Co.*, 15 F. Supp. 2d 621, 630 (E.D. Pa. 1998) (citing *Washington v. Phila. Cty. Court of*

*Common Pleas*, 89 F.3d 1031, 1036 (3d Cir. 1996)).  "[T]he court 'is presumed knowledgeable

as to the fees charged by attorneys in general and as to the quality of legal work presented to [it]

by particular attorneys.'"  *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs.*, No. 12-

1138-SLR, 2016 U.S. Dist. LEXIS 43252, at *13 (D. Del. Mar. 31, 2016) (citation, quotation marks omitted) (affirmed *per curium*, 714 F. App'x 1019 (Fed. Cir. 2018)). If the plaintiff has satisfied her burden, the defendant may contest that prima facie case, but only with appropriate record evidence. *Smith*, 107 F.3d at 225.  The objections must also be made with "sufficient specificity." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005).

### 1.  Reasonable rates

The American Intellectual Property Law Association (AIPLA) Economic Survey reports incomes and other demographic data for intellectual property attorneys.  *See* Excerpts from the 2019 Report, JDP Decl. Ex. C.

> "In addition to affidavits and declarations, the Court of Appeals for the Federal Circuit and other courts have relied upon the American Intellectual Property Law Association's (the "AIPLA") Economic Survey — which provides billing rates for intellectual property attorneys based on their degree of experience — to gauge the reasonableness of attorneys' fees incurred in patent litigation."

*Drone Techs., Inc. v. Parrot S.A., Civil Action No.* 2:14-cv-00111-AJS, 2015 U.S. Dist. LEXIS 98829, at *12-13 (W.D. Pa. July 21, 2015) (collecting cases).  The AIPLA Survey is competent and sufficient evidence of hourly rates in Philadelphia and Texas[13] for patent cases where over $1M is at stake.  JDP Decl., ¶5, Ex. C.  A typical patent with over $1Million at stake has an average attorney fee expended of $1.5Million to $3.5 Million.  *Id*. at I-143.

### 2.  The Petruzzi Law Firm reasonable rates

According to the AIPLA survey, billable rates for a patent litigation attorney with over 35 years' experience in Philadelphia and Texas are as high as $800/hr. and average $750/hr.  This

---

[13] If Defendants contest the reasonableness of Plaintiff's counsel's fees or hourly rates, they must submit their records for comparison.  *See E.C. & C.O. v. Sch. Dist. of Phila.*, 91 F. Supp. 3d 598 (E.D. Pa. 2015); *Sch. Dist. of Phila. v. Williams*, No. 14-6238, 2016 U.S. Dist. LEXIS 28443 (E.D. Pa. Mar. 7, 2016); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 587 (3d Cir. 1984).

reflects both the geographic rates, but also experience levels and subject matter in medical cases. See JDP Decl, ¶5, Ex. C (I-29).  A reasonable hourly rate may be established by the use of billing surveys. *See Mathis v. Spears*, 857 F.2d 749, 756 (Fed. Cir. 1988) (affirming district court's consideration of AIPLA in determining reasonable lodestar rate) (collecting cases)).  *See also Sabinsa Corp. v. Olive Lifesciences Pvt. Ltd.*, No. 16-3321 (FLW) (TJB), 2018 U.S. Dist. LEXIS 93365, at *23 (D.N.J. June 1, 2018) (approving rates three years ago as reasonable for patent litigation "ranging from $385.00 for a third-year associate to $850 for a senior partner"). Notably, the *Sabinsa* decision was considering rates for New Jersey, which the AIPLA Survey simply lists as "Other East," and shows rates lower in "Other East" than for Philadelphia.

Mr. Petruzzi has over 35 years' experience litigating patent infringement cases all over the country, has conducted numerous successful IPR defenses for patent owners, and has successfully litigated this case despite excessive and vexatious activity by Defense counsel.  *See* JDP Decl. ¶¶6, 14.  Based on Mr. Petruzzi's education and experience and the data found in the AIPLA Survey, a reasonable hourly rate for Mr. Petruzzi's work on this matter is $750/hr.[14]

Mr. Mason has over 30 years' experience litigating patent cases and other intellectual property disputes.  *See* JDP Decl. ¶ 15.  Based on Mr. Mason's education and experience and the AIPLA data, a reasonable hourly rate for Mr. Mason's work on this matter is $700/hr.

### 3. Maupin Redman reasonable rates

Laura Maupin and Michael Redman have in combination nearly 40 years of experience working on a variety of complex litigation matters.  Declaration of Laura N. Maupin, (hereinafter

---

[14] Plaintiff notes that, fees paid by Mr. Junker in this matter are unreasonably low because Mr. Petruzzi has been representing Mr. Junker in litigation of the D'839 patent for nearly 20 years, and has not been adjusting his rate with this longstanding client, an individual, in a manner consistent with the otherwise reasonable rates expected for such work done by an attorney of such qualifications.  JDP Decl., ¶ 11.  For an exceptional case, the Court must determine what a reasonable rate is for the work done using local current billable rates in patent cases.

"LNM Decl.") ¶¶ 4-5.  Based on 2019 Edition of the AIPLA Economic Survey (*see s*elected

excerpts, JDP Decl., Ex. C) Laura Maupin's work can reasonably be compared to the 75th

percentile group for lawyers in the 15-24 years of experience range, based on her experience and

the outcome of this litigation.  LNM Decl. ¶ 8, Based on her experience and AIPLA data, a

reasonable rate for her work on this matter is $650/hr.  Based on his experience the same survey

and data, a reasonable rate for Mr. Redman's work on this matter is $450/hr., based on the

median percentile group for lawyers in the 15-24 years of experience range. *Id*.

### 4.   Hours expended

Given the number of defenses, the complexity of the area of law, and Defendants'

conduct, Plaintiff's counsel expended a low number of hours, efficiently litigating the case

without waste.  Total hours for The Petruzzi Law Firm for pre-trial, trial and post-trial work on

this case over 7 years were 997.00 for Mr.  Petruzzi and 28.75 for Mr. Mason.  JDP Decl., ¶4,

Ex. B.   Maupin Redman expended 634.9 hours for pre-trial, trial, and post-trial work on this

case, of which, Laura Maupin worked 350 hours and Michael Redman worked 284.9 hours.

Declaration of Laura N. Maupin, ¶ 6, Ex. A.  Plaintiff's attorneys spent a very lean total of

1660.65 hours on this case over a 7-year period.

The totals above are well within the AIPLA averages both for hourly rates and time

expended in the case and are less than median fees in patent cases of this size and complexity.

### 5.   Summary of Attorneys' Fees Request

The Petruzzi Law Firm:  997 hours at $750/hr. for James Petruzzi (total $747,750) plus

Robert Mason 28.75 hours at $700/hr. (total $20,125) amounts to **$767,875**.

Maupin Redman:  350 hours for Laura Maupin at $650/hr. (total $227,500) and 284.9

hours for Michael Redman at $450/hr. (total $128,205) amounts to **$355,705**.

Combined total legal fees: **$1,123,580**

Plaintiff asks this Court to award a total attorney fee of **$1,088,950** to be included in the final judgment due to reduction for fees already paid by Defendants. [15]

### B. Enhanced Lodestar/Adjusted Reasonable Hourly Rate

 "Although there is a strong presumption that the lodestar figure represents a reasonable attorney fee, the Supreme Court has recognized a district court's discretion to adjust the lodestar figure upward or downward based upon other considerations." *Bywaters v. U.S.*, 670 F.3d 1221, 1229 (Fed Cir. 2012) (internal quotations, citations omitted). "The question is whether the amount involved and results obtained in this case warranted an adjustment." *Id*. The Supreme Court has made clear that "the most critical factor" in determining the reasonableness of a fee award is the degree of success obtained. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley v. Echerhart* 461 U.S. 424, 435 (1981) ("Where a plaintiff has obtained excellent results, … an enhanced award may be justified…The result is what matters."))[16]

Because the result in this case is remarkable, the Court would be well within its discretion to adjust the requested attorney fee upward. Plaintiff makes no specific request for the amount of enhanced fees or multiplier and relies on the Court's discretion.

### C. Non-taxable Costs

In addition to attorney fees, Mr. Junker seeks an award of his non-taxable costs incurred in this litigation under the exceptional case determination. "The reasonableness of costs is assessed on the same basis as attorney fees." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 05-897 (WHW)(CLW), 2018 U.S. Dist. LEXIS 88011, at *57 (D.N.J. Apr. 20, 2018), citing

---

[15] To avoid any duplication of fees, Plaintiff has reduced the total request by the fees paid by Defendants for the Gillespie Deposition for Mr. Petruzzi ($14,629.22) and the fees agreed to by the parties to resolve the prejudice motion and additional time to respond to the late submitted damages theories during trial ($20,000).
[16] Given that they asserted that this case was worth no more than $10,000, Defendants must surely concede that the results obtained by Plaintiff are remarkable.

*Loughner v. University of Pittsburgh*, 260 F. 3d 173, 181 (3d Cir. 2001). "Plaintiff may also recover "related non-taxable expenses," which may include "costs for postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food." *Arlington Indus. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2016 U.S. Dist. LEXIS 83493, at *43 (M.D. Pa. June 28, 2016) (citing *Bowers v. Foto-Wear, Inc.*, No. 3:cv-03-1137, 2007 U.S. Dist. LEXIS 84626, at *5 (M.D. Pa. Nov. 15, 2007)).

Reasonable and necessary costs that Plaintiff incurred as a result of the litigation are summarized here. They are also supported by detailed contemporaneous record keeping for travel, meals, hotel, data base management, copying and other required and reasonable expenses of the attorneys and of Mr. Junker as well.[17]

Other costs including travel for depositions, hotel and meals while out of town, copying charges for hearings and trial, monthly database costs to maintain Defendants' voluminous digital document production, and other costs are common and reasonable in this case.

Total costs, less taxable costs already submitted, are being sought in the amount of $115,390.65 from The Petruzzi Law Firm and $21,989.45 for Mr. Junker. These costs are set forth in Exhibit B of the JDP Declaration and Exhibit A of the Junker Declaration and comprise the following categories and amounts:

| | |
|---|---|
| Database Maintenance for Defendants' Documents Production | $51,928.73 |
| Photocopying/Graphics/ Document Preparation | $5,578.56 |
| Local Counsel Fees, Misc. and Filing Costs | $6,210.19 |
| Expert Witness Fees (see below argument) | $30,770.00 |

---

[17] And even these expenses were much lower than is common. For example, all three trial counsel rented an Airbnb for two weeks at a total cost of $4,000, rather than multiple hotel rooms that would have been at least $250/night for the two weeks, costing closer to $10,000.

| | |
|---|---|
| Deposition Transcripts | $8,156.30 |
| Travel Expenses (Airfares, Hotel, meals, parking) | $24,809.16 |
| Total Attorney Incurred Costs | $127,452.94 |
| Junker Individual Costs (Travel, meals, hotels) | $21,989.45 |

**Total Costs sought in this Motion (excludes Taxable costs):   $137,380.10**

**D. Prejudgment Interest on Attorneys' Fees and Expert Witness Fees**

**1. Prejudgment interest on fees**

"'[A] district court does have authority, in cases of 'bad faith or other exceptional circumstances,' to award pre-judgment interest" on the award of attorney fees under 35 U.S.C. § 285." *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988). The award of prejudgment interest on attorney's fees is not mandatory and is an equitable decision to be made by the Court." *Univ. of Pittsburgh v. Varian Med. Sys.*, No. 08cv1307, 2012 U.S. Dist. LEXIS 58156, at *30-31 (W.D. Pa. Apr. 25, 2012).

Mr. Junker was deprived the use of the money expended in this litigation and should be awarded interest on that amount as well.  Again, like the award of prejudgment interest discussed above, interest should be awarded on attorney fees at 15%, or alternatively 13.15% or 6%.  A final accounting of such interest will be provided on the Court's request after a final determination has been made as to the award of attorney fees and applicable rate of interest.

**2. Expert Fees**

Expert witness fees are not necessarily recoverable in a case otherwise found exceptional under § 285.   But:

> "[a] district court has inherent authority to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute. Use of this inherent authority is reserved for cases where the district court makes a finding of fraud or bad faith whereby the very temple of justice has been defiled.

> Accordingly, not every case that qualifies as exceptional under will also qualify
> for sanctions under the court's inherent power."

*MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012) (quoting *Takeda*

*Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008); *Amsted Indus.*

*Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (internal quotation marks

omitted)).

Further, because Defendants' conduct, especially as to damages in this case, was in bad

faith and is sanctionable, in addition to other non-taxable costs, this Court should award Plaintiff

the fees he spent on expert Peter Bressler, totaling $30,770.  JDP Decl., ₽ 4.  Mr. Bressler was

the former expert for Apple in the Apple/Samsung case.  He only charged $300/hr. in this case

which is well below market rates and below every Defense expert.  His expertise was invaluable

and relied upon by the Court in its findings of infringement and validity.  His total time expended

for initial evaluation of the case, claim construction hearings, summary judgment, and attendance

and testifying at trial was only 102.5 hours over a 7-year period.  His total bills, including $20 in

parking fees for trial, were $30,770, less than one half of just Defendant expert Trexler's fees.

The Court should award his entire fee and costs to Plaintiff.

## CONCLUSION

Plaintiff respectfully requests that his motion for attorneys' fees, interest and costs be

granted and that he be fully returned to the status he would have been in had Defendants not

willfully infringed on his patent and caused him such extensive expense to secure his rights.

Dated:  February 8, 2021

Respectfully submitted,

/s/ James D. Petruzzi

appearing *pro hac vice*

James D. Petruzzi
Texas Bar No. 15853280
The Petruzzi Law Firm
4900 Woodway, Suite 745
Houston, Texas 77056
Tel.: (713) 840-9993
Fax: (713) 877-9100
Jim@Petruzzi.com

Co-counsel

Alan S. Gold, Esq.
Gold and Ferrante, P.C.
261 Old York Road, Suite 526
Jenkintown, PA 19046
Tel.:  (215) 885-1118
Fax:  (215) 885-5283
asg@goldferrantelaw.com

Laura Maupin
appearing *pro hac vice*
Maupin Redman
Livingston, Texas 77399-1038
Tel.: (832) 930-0830
laura@maupinredman.com

Robert M. Mason
appearing *pro hac vice*
Law Offices of Robert M Mason
3870 Ponte Ave, Ste 676
Addison, Texas  75001
Tel.:  (214) 457-3690
RMason@PTCLaw.us

## CERTIFICATE OF SERVICE

I hereby certify that on this day, February 8, 2021, I caused a copy of the foregoing

**PLAINTIFF LARRY G. JUNKER'S MEMORANDUM IN SUPPORT OF HIS**

**MOTION FOR INTEREST, ATTORNEYS' FEES AND COSTS** to be electronically filed

with the Clerk of the United States District Court for the Eastern District of Pennsylvania by

using the CM/ECF system, which will send notice of such filing to all counsel of record.


/s/ James D. Petruzzi