**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LARRY G. JUNKER | § | CIVIL ACTION |
| *Plaintiff* | § | NO. 2:13-CV-04606 |
| | § | |
| v. | § | |
| | § | |
| | § | THE HONORABLE |
| MEDICAL COMPONENTS, INC. et al | § | MITCHELL S. GOLDBERG |
| | § | |
| *Defendants*. | § | |
| | § | |

<u>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR INTEREST, ATTORNEYS' FEES AND COSTS**</u>

Defendants Medical Components, Inc. and Martech Medical Products, Inc. (collectively "MedComp") respectfully submit their response to Plaintiff Larry G. Junker's ("Junker") Motion for Interest, Attorneys' Fees and Costs. Having failed to recover the vastly overstated damages he sought at trial based on a series of meritless and enigmatic legal theories, Junker now asks this Court to nevertheless award him fees, interest and costs that would result in a windfall for Junker more than four times greater than the actual damages he recovered at trial. Just as it did with baseless damages theories Junker pushed at trial, the Court should also reject his overstated and legally unsupported effort to obtain such windfall in the guise of interest, fees and costs.

As the Court noted in its January 14, 2021 Memorandum Opinion ("Opinion") [Doc. 305], Junker's damages theory at trial first focused on MedComp's net sales, claiming entitlement to damages in excess of $19 million. Opinion at 67. After missing with that assertion, Junker then went to "Plan B", resorting to his first fallback position by claiming entitlement to $13.9 million of MedComp's gross profits, a position the Court also correctly rejected. Opinion at 67-68. Undaunted by those two fruitless swings for the fences, Junker then

took yet a third approach based on a theory running directly contrary to the evidence, claiming that he should be awarded damages based on the false premise that of the many components in the kits sold by MedComp, the introducer sheath was one of the only four with any value. Applying this back of the envelope approach, Junker sought damages of approximately $3.9 million, which the Court also correctly rejected. Opinion at 68-69.

The various damages theories presented at trial were not the first ones Junker posited in this case. Indeed, a review of his supplemental response to Interrogatory No. 4, attached as Ex. "A" to the Declaration of Joseph C. Monahan submitted herewith ("Monahan Declaration"), reveals at least three prior iterations of his damages theories (with multiple permutations of each), all of which were without a fact or legal basis and none of which were supported by expert testimony. The high end of the alleged damages based on the various theories set forth in that Interrogatory response was "at least $50,000,000."

Supplemental Interrogatory Response at p. 7. In response to MedComp's *Daubert* motion [Doc. 246] attacking the damages theories Junker articulated in his Interrogatory response, Junker withdrew the theory leading to the $50 million claim. *See* Junker's Opposition to Daubert Motion [Doc. 253] at 3-4. Indeed, he abandoned all of those unorthodox and hyperbolic damages theories at trial. Despite repeated questioning from the Court, Junker's new damages theories and numbers remained a mystery to the defendant and the Court right up until the last day of trial. Clearly this is gross prejudice to the Defendant. When finally articulated after repeated questions from the bench, the Court rejected all of them. It is ironic and just as wrong now for Junker to argue, as he does, that his requested windfall is warranted by a "dizzying array of discarded legal theories" and "shifting damages claims" by the defense.

Junker's Memorandum in Support of His Motion for Interest, Attorneys' Fees and Costs ("Memorandum") [Doc. 310] at 1.

Having recovered but a fraction of the amounts he sought at trial (and an even smaller fraction of the more than $50 million he claimed before trial) Junker now asks the Court to not only find he is entitled to compounded pre-judgment interest, but proposes rates for such interest so outrageously excessive that he is unable to cite to any case from any jurisdiction to support the application of two of those proposed rates.  He also contends the case should be considered an "exceptional" one under 35 U.S.C. § 285 and seeks an award of his attorney fees and costs. For the reasons explained below, the Court should reject Junker's request for pre-judgment interest, should further reject his request that this case be deemed an exceptional case and should deny him his fees and costs.

## I.     The Court Should Not Award the Requested Prejudgment Interest.

### A.     The Court Should Reject as Excessive the Prejudgment Interest Rates and Time Period Proposed by Junker.

Even if the Court is inclined to award Junker some amount for pre-judgment interest, it should not award him interest for the entire duration for which he advocates, nor should it apply the excessive interest rates he proposes.  The purpose of pre-judgment interest is compensatory, not punitive.  "Prejudgment interest has no punitive, but only compensatory, purposes. Interest compensates the patent owner for the use of its money between the date of injury and the date of judgment." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996).

#### 1.     Junker Is Not Entitled to Interest for the Duration of Time He Claims.

In seeking pre-judgment interest from the date of the first sale of any of the accused products in 2009 through January 14, 2021, the date of judgment, Junker overreaches and betrays

a misunderstanding of the law.  A patent holder is not entitled to pre-judgment interest during the period after expiration of the subject patent.  *I-Flow Corp. v. Apex Medical Techs., Inc.*, No. 07-cv-1200, 2010 WL 114005, *4 (S.D. Cal. January 6, 2020), *citing Group One, Ltd. v. Hallmark Cards, Inc*., 407 F.3d 1297, 1308 (Fed. Cir. 2005).  As Junker would have no right to even sue for infringement during the period when his patent had lapsed, he likewise is not entitled to pre-judgment interest during that same period.  *Group One* at 1308 ("Because Group One could not have initiated a suit for patent infringement during the time that the '752 patent was expired, there is a basis for concluding that it should not be allowed prejudgment interest with respect to the '752 patent during the same period").  The Junker patent in suit was issued on November 20, 2001 and, as made clear on its face, the term of the patent was fourteen years.  Plaintiff's Trial Exh. 1 ('839 patent).  Accordingly, that patent expired as of November 20, 2015.  Even if the Court were to award Junker pre-judgment interest from the date of first sale up to the date his patent expired, the Court should not award Junker pre-judgment interest for the period after November 20, 2015.

### 2.    Junker Is Not Entitled to Pre-Judgment Interest at the Excessive Rates He Claims.

Disregarding the well-established principle that the purpose behind pre-judgment interest awards is not punitive, Junker nevertheless urges use of three different compounded interest rates, which are so excessive that their application would have a manifestly punitive impact on MedComp, with the greatest of those rates (15%) operating to multiply the current judgment by a factor of almost three.  It is telling that Junker is unable to point to even one court anywhere that has approved of the application of the highest two of those rates (13.5% and 15%), and instead rests his argument on nothing more than the conclusory, unsupported and nakedly speculative statement in Junker's Declaration [Dec. 310-10] that the amounts represented by MedComp's

disgorged profits "would have been returned to the business and have generated in excess of a 15% return."  Junker Declaration at ¶ 6.

Junker's punitive intent in even suggesting these outrageous rates is further laid bare when considering the position he took in a different piece of patent litigation also concerning the '839 patent.  In *Junker v.  HDC Corp*., No. c-07-05094, 2008 WL 3385819 (N.D. Cal. July 28, 2008), Junker obtained a default judgment in his suit against HDC Corp. for its alleged infringement of the '839 patent.[1]  Unlike the rates for which he advocates in the instant case, there he urged the application of the simple prime rate (not compounded).  The court agreed.  *Id*. at *6.

In sharp contrast to his approach in that case, Junker now seeks not only the application of an outrageous interest rate, but also wants that interest compounded quarterly.  The Court should reject both the proposed rates and the proposed compounding.  While the Court "has discretion to determine whether the rate of prejudgment interest should be simple or compounded," federal courts may consider state law in making this determination, and Pennsylvania law mandates that awards of prejudgment interest be calculated at a simple rate. *Checkpoint Systems, Inc. v. All-Tag Security S.A.*, 2015 WL 7756170, at *6 (E.D. Pa. Dec. 2, 2015), *rev'd on other grounds*, 858 F.3d 1371 (Fed. Cir. 2017).  Even if the court determines compound interest is warranted, a quarterly calculation provides too significant a windfall to Junker.  An annual calculation would be more appropriate.  *Moffitt v. Tunkhannock Area Sch. Dist.*, 2017 WL 319154, at *19 (M.D. Pa. Jan. 20, 2017) ("the court finds the better method to be interest compounded annually, not quarterly. This strikes some balance between taking no

---

[1] In what appears to be Junker's default position, he also argued there, though the same counsel representing him in this case, that the case was an exceptional one.  The court rejected that assertion.  *Junker* at *6.

account of the time value of money and penalizing the defendant for the length of a case, which will often take several years to resolve.").

Junker's change of position as to pre-judgment interest between the two cases, one where he won by default and the other where MedComp defended itself through trial, is interesting to note, and suggests Junker's current desire is to seek a pre-judgment interest measure in this case that will serve to punish MedComp. Such an award is unquestionably inappropriate. *Oiness* at 1033 ("Prejudgment interest has no punitive, but only compensatory, purposes.")

Rather than adopt the excessive compounded rates proposed by Junker, the Court instead should apply the simple "prime rate," just as Junker offered in the California litigation. "Courts have recognized that the prime rate best compensates a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is a better measure of the harm suffered as a result of the loss of the use of money over time." *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 364 (D. Del. 2018). As the Court is aware, Junker never manufactured the product at issue and, thus, could never have earned any profits. Junker's analysis of prejudgment interest—that it serves to compensate him for the lost ability to invest the Court's damages award—is inapposite, as Junker would not have earned MedComp's profits on his own, having never manufactured the product. The *Amgen* analysis is more appropriate, as it reflects the cost of borrowing money—the only way Junker would have had access to these funds during the pendency of the litigation. From December 16, 2008, up to the date that Junker's patent expired, November 20, 2015, the Prime Rate was 3.25%.[2] This time period encompasses the full time period during which the Court found infringement. Applying this rate to the profits earned by MedComp and Martech, if the Court is inclined to award Junker

---

[2] *See* "Historical Prime Rate," *JPMorgan Chase*, https://www.jpmorganchase.com/about/our-business/historical-prime-rate (last accessed March 8, 2021).

prejudgment interest, it only should award him $188,571.80.  *See* Exhibit "B" to the Monahan

Declaration (calculating simple 3.25% interest for each year of sales).[3]

## II.        This Is Not an Exceptional Case Warranting an Award of Fees and Costs.

An "exceptional" case is one that "stands out from others with respect to the substantive

strength of a party's litigating position (considering both the governing law and the facts of the

case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON*

*Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).  While MedComp did not prevail at trial,

*Octane Fitness* and cases decided thereafter make clear that this is not an exceptional case.  *See*

*SFA Systems, LLC v Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (*quoting Octane Fitness*

at 1756) ("a party's position on issues of law ultimately need not be correct for them to . . . be

found reasonable"); *Stone Basket Innovations, LLC v. Cook Medical LLC*, 892, F.3d 1175, 1180

(Fed. Cir. 2018) (*citing SFA Systems* at 1348) ("a strong or even correct litigating position is not

the standard by which we assess exceptionality"); *SIMO Holdings Inc. v. Hong Kong uCloudlink*

*Network Technology Limited*, 396 F. Supp. 3d 323, 352-3 (S.D.N.Y. 2019) (that arguments were

not successful does not mean it was unreasonable to take case to trial, not does finding of willful

infringement necessarily make the case an "exceptional" one).[4]

---

[3] While compounding that interest is not warranted here, in the event the Court disagrees, the compounding should be annual, not quarterly as Junker now advocates.  As detailed on Exhibit "B" to the Monahan Declaration, such an annual compounding of the Prime Rate through expiration of the patent results in a total award of prejudgment interest of $223,984.27.

[4]  In declining to find the case an exceptional one, the *SIMO Holdings* court noted that it disagreed the case was not a close one.  *Id.* at 352.  As in that case, a reading of the Court's Opinion suggests that the instant case was also a close one in at least two respects, eviscerating Junker's argument that he is entitled to fees and costs due to MedComp's ultimate loss at trial. For one, the Court recognized uncertainty in the law concerning the analysis of the article of manufacture.  *See* Opinion at p. 62-63 and footnote 20.  Secondly, Junker's own expert was reluctant to testify that MedComp's valved tearaway product was substantially the same as the patent in suit.  Opinion at 24, ¶ 77.  Indeed, Junker was unable to prevail on summary judgment as to either infringement or invalidity, despite relying on the report of that same expert. [Doc. 197]. *See* January 4, 2019 Order [Doc. 220].

**A.      The Court's Finding of Willful Infringement Alone Is Not Sufficient to Support an Award of Attorneys' Fees.**

"While willfulness is among the reasons that a court may find a case to be exceptional, an attorney fee award is not mandatory when willful infringement has been found." *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020) (declining to find the case was exceptional despite finding of willful infringement).  While MedComp acknowledges the Court's finding of willful infringement, MedComp respectfully maintains that this ruling alone does not warrant a further finding that the case is exceptional pursuant to § 285, particularly given the nature of the evidence on which the Court made its ruling.

**B.      The 2004 Letter Was Not Notice of Infringement to Support Exceptionality.**

In urging the Court to determine this case is an exceptional one, Junker emphasizes the Court's finding that MedComp willfully infringed Junker's patent.  Willful infringement requires a finding by clear and convincing evidence. *nCube Corp. v. Seachange Int'l Inc.*, 436 F.3d 1317, 1318 (Fed. Cir. 2006).  Here, the *sole* evidence presented  in support of this finding was a January 9, 2004 letter that Junker claimed had been sent to a series of Galt Medical ("Galt") customers to advise them of the result of the infringement litigation between Junker and Galt in the United States District Court for the Northern District of Texas and which claimed products MedComp had purchased from Galt infringed the Junker patent.  Plaintiff's Trial Exh. 22.1.  The letter did not accuse any specific MedComp-made introducer sheath handle of infringement, nor could it, *since MedComp did not begin selling the accused products until more than five years after the date of this letter* (July 15, 2009 for the Valved Tearaway; *see* Def. Ex. 160 and February 15, 2010 for the Super Sheath; *see* Def. Ex. 161).  At trial, Junker was unable to present any evidence that this letter was actually received by MedComp, and instead had to resort to

arguing presumptive delivery pursuant to the "mailbox rule."  In fact, MedComp's President

Timothy Schweikert testified that to his knowledge, MedComp never received the letter and that

if it had, he would expect it would have been brought to his attention. It was not.  Schweikert

Testimony, Tr. Trans. Vol. 6, p. 5.   He further testified that upon receiving notice of Junker's

lawsuit in 2013, MedComp redesigned the handle of the introducer sheath it was making at that

point so as to steer clear of any alleged infringement.  Schweikert Testimony, Tr. Trans. Vol. 6,

p. 6.

Moreover, the undisputed trial testimony of both Mr. Schweikert and MedComp's Vice

President of Engineering, Kevin Sanford, was that the only introducer sheath that MedComp had

ever purchased from Galt Medical did not have a rounded handle at all.  Schweikert Testimony,

Tr. Trans. Vol. 6, p. 41; 48-9; Sanford Testimony, Tr. Trans. Vol. 8, p. 19; Def. Trial Exh. 121(i)

(photograph of handle purchased from Galt, more rectangular in shape and devoid of enlarged,

rounded ears).  Mr. Sanford testified that when MedComp ultimately decided to make its own

handle for the introducer sheath, rather than continue to purchase it from a third-party supplier

(whether Galt or another supplier), it chose to make it rounded to avoid having sharp corners on

the handle and because it would be easier to manufacture a molded part with rounded corners,

not based upon the design in the '839 patent as Junker asserted.  Sanford Testimony, Tr. Trans.

Vol. 8, pp. 22-3.

Even had MedComp received the 2004 letter, it did not serve as sufficient notice to

MedComp, as at the time the letter was sent, MedComp did not even make any of the accused

products.  In fact, MedComp did not begin to sell the alleged infringing products until 2009 -

five years after the letter.  35 U.S.C. §287 provides a limit on damages for the period of time

before a patent holder provides valid notice of infringement.  In order to constitute <u>valid</u> notice

under §287, "actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device. . . . It is irrelevant, contrary to the district court's conclusion, whether the defendant knew of the patent or knew of his own infringement. The correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or understanding of the infringer." *Armsted Industries Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994) ("*Armsted I*"). *See also Gart v. Logitech*, 254 F.3d 1334, 1345 (Fed. Cir. 2001) (citing *Armsted I* and noting actual notice requires affirmative communication of a specific charge of infringement by a specific accused product or device).

As a patent holder that does not make or sell a product covered by the patent at issue, Junker is what is known in-patent litigation as a "non-practicing entity" ("NPE")." While §287 does not limit a non-practicing entity's damages remedy, §287 jurisprudence is nevertheless instructive as to what constitutes valid notice of infringement for purposes of willfulness and the exceptionality of a case.  Given the potential consequences that can flow from such findings, MedComp respectfully submits that where the only evidence offered in support of a willfulness finding was a letter alleged to be sent 5 years before any act of infringement cannot meet the notice standard set forth in *Armsted I* and *Gart*, which did not identify any of the accused products as allegedly infringing at the time of the letter, which MedComp testified it did not receive in any event, and which was dated more than five years before MedComp even made or sold any of the accused products, a willfulness finding based on such letter does not support the notion that the case is an exceptional one.

## C.   There Was No Litigation Misconduct Warranting an Exceptional Case Determination.

In an effort to convince the Court that it should find this case to be exceptional, Junker argues that MedComp has engaged in litigation misconduct in a number of respects, even making the outrageous and baseless accusation that Medcomp has suborned perjury.  Junker is wrong.

Junker hangs much of his false misconduct argument on what he calls MedComp's "misrepresentation" regarding damages.  While MedComp acknowledges and sincerely regrets that there was any confusion on its part and on the part of its counsel as to the period of time the accused products were sold, the number of units sold and the profits associated with those sales, MedComp categorically denies it ever intentionally misrepresented that information or tried to intentionally mislead Junker regarding the same.  As explained at trial, much of MedComp's difficulty in providing accurate information was due to the fact that as the design of the accused products changed, the part numbers did not, rendering it very difficult for MedComp to determine the relevant information for itself.  Schweikert Testimony, Tr. Trans. Vol. 5 at pp. 108-109.  Compounding that problem was the fact that MedComp was forced to change damages experts very shortly before its expert report was due in 2014.  In the rush to complete the report with the substitute expert to meet the discovery deadline, mistakes were made.[5] Any notion that these mistakes were part of a nefarious scheme to mislead Junker should be destroyed by the undeniable fact that as MedComp prepared for trial and ultimately discovered the inaccurate damages information contained in its then-current expert report, it undertook an exhaustive

---

[5] Before that switch became necessary, Ms. Trexler's colleague had been preparing to serve as MedComp's expert witness, and her role in the matter was limited to serving as an internal resource to provide feedback on the expert's analysis to the extent needed.  When the initial expert suddenly became unavailable very close to the deadline for the submission of expert reports, Ms. Trexler was pressed into service in a far more expansive role than neither she nor MedComp had anticipated.

analysis of its own records and corrected that report, the effect of which correction was to *increase* the profits attributable to the accused products, *a change that redounded to Junker's benefit*.[6]

Junker also accuses MedComp of suborning perjury from witnesses Mssrs. Eddings and Gillespie, although he fails to detail exactly what testimony they provided that differed from any earlier testimony.  Instead, Junker merely cites to footnote 15 in the Court's January 14, 2021 Opinion.  That footnote, however, does not support the claim that MedComp suborned perjury from Eddings or Gillespie.  As to Eddings, the footnote explains that the Court found his testimony regarding inventorship to be "inherently biased", and notes that a prior jury found him to have infringed the '839 patent.  Junker's defamatory accusation notwithstanding, the Court's observation falls far short of establishing Eddings perjured himself or that MedComp had a hand in suborning the same.  Likewise, with respect to Gillespie, the Court noted that Gillespie acknowledged in his trial deposition that he had not testified in the earlier lawsuit against Xentek that he and Eddings were co-inventors of the features described in the patent in suit.  Left unstated in the footnote is that Gillespie further testified that he had never previously been asked a question at the earlier trial that would have even elicited such testimony.  Gillespie Trial

---

[6] Moreover, as Junker concedes, the Court has already sanctioned MedComp for the late production of the corrected damages report by excluding the sections pertaining to one of four damages scenarios ("Scenario 1D") and by awarding  Junker the attorney fees incurred in moving to exclude that report.  *See* March 19, 2020 Memorandum Opinion [Doc. 298].  As such, Junker's reliance thereon as supposed support for his current argument the case is exceptional smacks of double counting and as an impermissible second "bite at the apple". The exclusion of Scenario 1D occurred in response to Junker's second request of the Court to exclude one of MedComp's damages expert reports.  Junker earlier moved to strike the first corrected report on April 2, 2015 [Doc. 132].  The Court denied that motion but gave Junker the opportunity to depose MedComp's damages expert regarding the corrections she made to her initial report [Doc. 137].  Junker declined that opportunity.  Therefore, Junker's declination coupled with the fact that the Court previously considered – and rejected – the argument that MedComp's corrected damages report should be excluded undermines Junker's current assertion that the corrections to the damages reports renders this case an exceptional one.

Deposition at 216-217.  As with Eddings, the fact that the Court did not find Gillespie to be a credible witness as to inventorship is a far cry from determining that MedComp suborned perjury.

In his fever to portray MedComp in as negative a light as possible, Junker distorts the facts, claiming MedComp spoliated evidence in direct response to his request for production of same.  Junker is simply incorrect.  The evidence at trial established that the date of last sale for the Valved Tearaway was April 23, 2014.  Def. Trial Exh. 160.  The date of last sale of the Super Sheath product was May 6, 2014.  Def. Trial Exh. 161.  When Junker represents, on page 18 of his Memorandum, that "early in the litigation Plaintiff sought from Defendants examples of kits containing the accused products," Junker neglects to share with the Court that by "early in the litigation" he apparently means sometime in October of 2014, more than a year after the case was filed in August 2013.  *See* Ex. 3 to Junker's Memorandum Regarding Prejudice [Doc. 295]. By the time he made this request, it had been months since MedComp ceased selling kits containing the accused products and no such kits remained in its possession.  Junker is incorrect in accusing MedComp of destroying the kits rather than provide them to Junker in response to his request.  To the contrary, Junker's request came long after MedComp had sold out of the requested kits.  Notably, Junker never contends he was not provided with samples of the accused products themselves, but instead complains only that by the time he got around to requesting the kits containing those products, MedComp had already sold them such that it had none to provide. Junker's assertion that "rather than turn over any such kits, Defendants destroyed them" is manifestly untrue, and as such, Junker is unable to provide any evidence to support his baseless accusation.

Junker also raises the fact that Mr. Gillespie was represented in his trial deposition by independent counsel, who instructed Mr. Gillespie not to answer a question based on a "common defense" privilege.  The Court has already reviewed this exchange and questioned Mr. Gillespie's counsel as to the basis for the instruction, reviewing the applicable common interest agreement in the process.  Trial Transcript, Vol. 5 at 120-142.  While the Court ultimately requested Gillespie to answer certain limited questions that Junker had in fact failed to ask at the deposition but which he claimed he would have liked to ask, the Court only did so after requiring Junker to confirm on the record that he had no intention of filing suit against Gillespie, thus satisfying the Court and Gillespie's counsel that the invocation of the common defense privilege would be unnecessary.  The Court did not indicate that Gillespie's counsel's instruction was not warranted, nor did it determine there was no valid common defense privilege.  This is yet another example of Junker's overreaching to suggest anything to the contrary now.

Likewise of no moment is Junker's reference to the fact that MedComp's counsel previously represented Eddings and Gillespie at their earlier depositions.  Junker previously raised this same issue with Judge Restrepo in a Motion to Strike [Docs. 132, 160].  Judge Restrepo rejected Junker's position more than five years ago when the Court declined to preclude Eddings' and Gillespie's testimony or to disqualify MedComp's counsel.  *See* Doc. 162.  There is no reason to revive those unsuccessful arguments now.  Moreover, it should go without saying that a party cannot rely on the fact of a losing motion to support a claim that the opposing party took an unreasonable litigation position. Indeed, it was Junker that raised and lost these unfounded claims against MedComp.

Junker also tries to make much of the fact that over the history of this protracted litigation, during which time Mr. Zaher practiced with four different law firms, a number of

different attorneys worked on the matter, and that MedComp had a "crowd" at trial.  Junker Memorandum of Law at 19.  MedComp acknowledges that multiple lawyers worked on the case over the years, as Mr. Zaher's client followed him as he moved his practice during the pendency of the case.  This hardly makes this case an exceptional one.  Moreover, as the Court will recall, the "crowd" MedComp brought to trial included three junior level associates, two of whom were given trial experience and the opportunity to question witnesses and argue motions.  In fact, the Court commended MedComp's trial counsel for providing such opportunities for junior associates.  The Court should reject Junker's cynical effort to hijack that positive and use it as justification for a finding this case is an exceptional one.

> ### D.      MedComp's Raising of Defenses Is Not an Unreasonable Litigation Practice Nor Does It Render the Case Exceptional.

Incredibly, Junker makes the novel argument that a defendant's decision to raise defenses potentially available to it, even if ultimately unsuccessful or later abandoned after discovery, means such defendant has engaged in unreasonable litigation tactics, thus supporting an exceptional case finding.  Junker's Memorandum at 16-17.  If that were the law then every case would be an exceptional one, which clearly is not the case.  It comes as no surprise that Junker is unable to cite any supportive caselaw for this outlandish assertion.  In fact, the law is directly to the contrary. *See SFA Systems, supra* at 1348 ("a party's position on issues of law ultimately need not be correct for them to . . . be found reasonable"); *Stone Basket Innovations, supra* at 1180 ("a strong or even correct litigating position is not the standard by which we assess exceptionality"); *SIMO Holdings, supra* at 352-3 (that arguments were not successful does not

mean it was unreasonable to take case to trial, not does finding of willful infringement

necessarily make the case an "exceptional" one.[7]

### E.      Junker's Suggestion His Fees Should Be Adjusted Upwards is Demonstrably Without Justification

Not only does Junker seek the actual fees he incurred, he also invites the Court to

"adjust" those fees upward based on what he describes as the "remarkable" result in the case.

Junker Memorandum at 26.  In so doing, Junker cites to *Farrar v. Hobby*, 506 U.S. 103, 114

(1992) and argues, "'the most critical factor' in determining the reasonableness of a fee award is

the degree of success obtained."  *Id*.  Where under one of Junker's pre-trial damages theories,

eventually abandoned, he claimed an entitlement to "at least $50,000,000", and where under

even the lowest damages figure he finally revealed at trial he claimed an entitlement to $3.9

million, his ultimate recovery of approximately $1.2 million is remarkable only for the degree to

which it fell short of the inflated damages he sought from the outset, and continued to seek

throughout.  This result does not merit an award of fees or costs at all, and certainly not a fee

award essentially equal to the damages Junker recovered.  It is beyond question that the Court

should not countenance the upward adjustment Junker invites.

---

[7] *See also Mankes v. Vivid Seats Ltd*., 822 F.3d 1302, 1312 (Fed. Cir. 2016).  "Here, the district court could readily view Mr. Mankes as having reasonably, openly, and in good faith pressed arguments for plausibly result-altering changes in governing legal standards that were demonstrably under active judicial reconsideration in this court and the Supreme Court at the time. While Mr. Mankes's case was pending before the district court, the law on divided infringement remained uncertain, with both our court and the Supreme Court weighing in on possible changes, and Mr. Mankes's litigation conduct appropriately reflected that shifting legal landscape. Without addressing other situations, we conclude that, in these circumstances, the district court properly determined that this case, to date, has not been exceptional in a way that would justify an award of fees against Mr. Mankes."  The same analysis applies to MedComp's position regarding the article of manufacture, an issue about which the Court expressly acknowledged the law is unsettled in light of several recent judicial decisions.  Opinion at 62-63.

**F.     The Court Should Not Award Prejudgment Interest on any Fees Awarded.**

Junker not only seeks millions of dollars in prejudgment interest on his damages and an attorneys' fees award in excess of $1 million—he also seeks prejudgment interest ***on his attorneys' fees***.  Such a windfall is far beyond the pale of what is warranted in a relatively routine case alleging design patent infringement.  While an award of prejudgment interest on attorneys' fees is in the discretion of the Court, the Federal Circuit has cautioned that in patent cases, this should only be granted in cases of "bad faith or other exceptional circumstances." *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988).  For all the reasons explained above, no such circumstances exist here.

**G.     The Court Should Reject Junker's Request to Recover His Expert Fees.**

In another overreach, Junker asks the Court to award him not only his attorney fees and excessive prejudgment interest, but also the fees incurred for his expert witness.  The Federal Circuit has made very clear that expert fees are not included within the fees that may be awarded under 35 U.S.C. § 285.  *Armsted Industries Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 377 (Fed. Cir. 1994) ("*Armsted II*") (error to award expert witness fees under § 285).  As the *Armsted II* court explained, an award of expert fees is only appropriate as a sanction where there has been "a finding of fraud or abuse of the judicial process" which requires more than a finding that the case is exceptional.  *Id.* at 378.  "Indeed, not every case qualifying as 'exceptional' under section 285 will qualify for sanctions under the court's inherent power. . . This court must therefore assess whether this case goes sufficiently beyond 'exceptional' within the meaning of section 285 to justify an award of expert fees as a sanction under the court's inherent power." *Id.* at 378-79.  Absent a "fraud on the court to the extent of defiling 'the very temple of justice'",

expert fees are not to be awarded, even in the context of an exceptional case. *Id*. at 379. Junker has not and cannot make the required showing here.

Junker's expert fees are also not recoverable as taxable costs under 28 U.SC. § 1920, as it only provides for the shifting of expert fees to the extent consistent with the $40 per day cap set forth in 28 U.S.C. § 1821(b). *Armsted II* at 379 ("district court erred by awarding Buckeye expert witness fees beyond the limits of 28 U.S.C. § 1821(b).

### H.      The Court Should Reject Junker's Request for Certain Non-Taxable Costs.

In addition to his attorneys' fees and expert fees, Junker also seeks recovery of a host of non-taxable costs, over and above the taxable costs described in the Bill of Costs Junker previously submitted [Doc. 307].[8] Specifically, he now seeks a total of $137,380.10, which includes, in addition to the duplicate items noted in footnote 8, amounts for "database maintenance" ($51,928.73), "local counsel fees, misc. and filing fees" ($6,210.19), the aforementioned "expert witness fees" ($30,770) and travel expenses ($24,809.16), plus Junker's own travel, meals and costs in the amount of $21,989.45. Junker Memorandum, pp. 27-28.

As a threshold matter, while certain specifically listed taxable costs are potentially recoverable by a prevailing party under 28 U.S.C. § 1920, that statute has no application to the

---

[8] While Junker maintains the costs he seeks in the instant Motion exclude the taxable costs from his Bill of Costs, there is duplication between the items he now seeks and the items listed in his Bill of Costs, but the extent of that duplication is not readily apparent. Specifically, while in both documents he lists $8,156.30 for deposition transcripts, it is unclear how the $3,505.99 that he lists in the Bill of Costs for copies relates to the $5,578.56 he seeks through his Motion for "photocopying/graphics/document preparation." Compare Doc. 307 and Junker Memorandum, pp. 27-28.

type of non-taxable costs Junker seeks, and Junker does not specify the authority on which his request for non-taxable costs relies.[9]

The Court should reject Junker's request to recover his alleged personal expenses regardless, as he provides no authority to support this request.  The court in *Bowers*, *supra*, cited by Junker himself, also rejected a claim for such personal expenses.  *Bowers* at *6.  Even were Junker able to provide authority that actually supported his request, he simply does not provide sufficient information regarding his alleged personal expenses to justify their inclusion in any award of costs.  Among his other alleged personal expenses, Junker seeks $5,350 for his attendance at a trade show.  Declaration of Larry Junker [Doc 310-10] at ¶ 7.  While Junker testified that he discovered the accused products at a trade show, there is no indication that Junker's sole purpose in attending that show was to investigate those products. Therefore, he fails to establish any credible reason that MedComp should bear the cost of his attendance at that show.  As someone engaged in the medical products industry, Junker no doubt had reasons to attend the trade show that had nothing to do with investigating the accused products.[10]  Likewise, he provides no detail for the $6,956 in claimed hotel charges and $6,156 in airline tickets, other than making the unsupported assertion that they represent charges for "attending depositions, settlement conferences, hearings and trial."  *Id*.  How many flights do those charges represent?  What were the dates and destinations of those flights?  For what purpose did he make each trip?

---

[9] In fact, two of Junker's cases are not patent cases at all.  One analyzed an award of fees and costs under the Fair Labor Standards Act, a statutory scheme not applicable here.  *See Loughner v. University of Pittsburgh*, 260 F.3d 173, 177 (3rd Cir. 2001) while the other, *Bowers v. Foto-Wear, Inc*., No. 3:cv-03-1137, 2007 WL 4086339, *4 (M.D. Pa. Nov. 15, 2007), a wage and hour case, analyzed the claim for non-taxable costs under Fed. R. Civ. P. 54(d).

[10] In fact, the record is devoid of any evidence that Junker's purpose in attending the conference had anything to do with the accused products at all, and it is entirely possible that Junker only came across those products at the conference by happenstance while walking through the conference display booths.

Did Junker fly coach or first class?  Likewise, how many hotel nights comprise the nearly $7,000 in hotels?  In which cities?  Did he extend his stay on any of those trips for reasons unrelated to the litigation?  Did he stay in a reasonably priced room or in the penthouse of the most expensive hotel in town?   Junker provides no information to answer these critical questions.

In sum, even if the Court is inclined to award any costs to Junker, it nevertheless should reject Junker's request for certain of those alleged non-taxable costs, namely (i) his expert fees; (ii) the duplicate items noted in footnote 8; and (iii) his personal expenses.

### III.    Conclusion

Notwithstanding the indisputable fact that the damages ultimately awarded to Junker fall very far short of the damages he sought herein, Junker nevertheless argues that this case is an exceptional one, warranting an award of his attorneys' fees and costs.  As is patently clear, Junker also would have this Court impose an impermissible punishment on MedComp in the form of prejudgment interest based on outrageous proposed interest rates, and he piles on by advocating the interest should be compounded quarterly.  The Court should reject Junker's requests.

Junker's polemic notwithstanding, this case is simply not exceptional for all of the reasons explained above.  Moreover, his request for an award of fees and costs roughly equal in value to the $1.2 million judgment he obtained is manifestly unwarranted.  His own case, *Farrar v. Hobby*, 506 U.S. 103, 114 (1992), indicates that "'the most critical factor'" in determining the reasonableness of a fee award is the degree of success obtained."  Applying that "most critical factor" here, the Court should refuse to award any of the fees or costs Junker incurred in unsuccessfully seeking the inflated damages he sought in the case, which ranged from a high of "at least $50,000,000" at the time he served his supplemental response to Interrogatory No. 4, to

a low of $3.9 million at trial (after also unsuccessfully pushing alternate trial damages theories

seeking $19 million and $13.9 million).  Junker recovered a mere 2% of the "at least

$50,000,000" to which he previously claimed entitlement, only 6.5% of the $19 million he first

sought at trial and only 9% of the $13.9 million he claimed in his first trial fallback theory.

Compared to even the lowest of Junker's multiple damages claims of $3.9 million, the judgment

only amounted to 32% of that figure.

As for Junker's request for prejudgment interest, if the Court is inclined to afford Junker

any prejudgment interest at all, it should only cover the period between the date the accused

products were first sold and the date the patent in suit expired, and it should be based on the

same interest rate for which Junker advocated in the case in California where he sued on the

same '839 patent at issue here – the simple Prime Rate.  Applying that same rate here leads to

prejudgment interest for the applicable period of $188,571.80.


Dated: March 10, 2021


Respectfully Submitted,

*/s/ Alfred W. Zaher*
Alfred W. Zaher
Joseph C. Monahan
A. Nicole Phillips
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103
(215) 772-1500

***Attorneys for Defendants Medical Components, Inc.
and Martech Medical Products, Inc.***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 10, 2021, I caused a copy of the

foregoing Response to Plaintiff's Motion for Interest, Attorneys' Fees and Costs, and proposed

form of Order, to be served via ECF on all counsel of record.


/s/*Joseph C. Monahan*